IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| NATALIE M. GRIDER, M.D., et al. | : CIVIL ACTION |
| Plaintiffs, | : NO. 2001-CV-05641 |
| vs. | : |
| | : CLASS ACTION |
| KEYSTONE HEALTH PLAN CENTRAL INC., HIGHMARK INC., JOHN S. BROUSE, CAPITAL BLUE CROSS, JAMES M. MEAD and JOSEPH PFISTER | : |
| Defendants. | : |

AMENDED COMPLAINT

FILED
MAR 15 2004
MICHAEL ___, ___
By ___ Dep. Clerk

Plaintiffs, Natalie M. Grider, MD, and Kutztown Family Medicine, P.C., bring this Class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf all others similarly situated, and allege the following upon information and belief, except as to paragraphs 2 and 3, which are alleged upon knowledge:

## INTRODUCTION

1)      This Class action seeks damages, injunctive and declaratory relief on behalf of a Class of all physicians, medical practitioners, and physician/medical groups who participate in Keystone Health Plan Central, Inc.'s health maintenance organization.

2)      Plaintiff, Natalie Grider, M.D., is a family practitioner, a resident of the Commonwealth of Pennsylvania, and a citizen of the United States of America. Dr. Grider provides or has provided services to patients insured with Defendant Keystone

1

Health Plan Central, Inc. and for the pecuniary benefit of Defendants Capital Blue Cross and Highmark Inc.

3) Dr. Grider also serves as President of Plaintiff Kutztown Family Medicine, P.C., located at 15050 Kutztown Road, Kutztown, PA 19530. Along with its affiliated practices, also controlled by Dr. Grider, Kutztown Family Medicine, P.C. serves some four thousand (4,000) patients insured with Defendant Keystone Health Plan Central, Inc.

4) Defendant Keystone Health Plan Central, Inc., ("Keystone HMO") is an Health Maintenance Organization ("HMO"), that provides a pre-paid, managed health care plan. Keystone HMO defines its role on behalf of its participants as simply meaning that "[they] provide and pay for all medically necessary health services, as well as many preventative services".

5) Defendants Capital Blue Cross ("Capital") and Highmark Inc. ("Highmark") receive all of the profits from Keystone HMO and, in conjunction with Keystone HMO, have knowingly devised, participate in, and conduct an illicit scheme whereby funds that have been rightfully earned by physician payments are diverted by them to their own profits.

6) Defendants Joseph Pfister, John S. Brouse, and James M. Mead are the Chief Executive Officers of Keystone HMO, Highmark, and Capital, respectively. Each of these individuals, in their capacity as agent, employee, officer, or the like, directed and controlled the activities of Keystone HMO, Highmark, and Capital as alleged and discussed below. It is believed, and therefore averred, that each of these individuals

knowingly and intentionally undertook and directed that their respective companies undertake the illicit practices which are the subject of this suit.

7) Acting in concert, Defendants have undertaken a common scheme to systematically deny, delay, and diminish payments to health care providers. To wit, Defendants routinely and improperly:

   a. manipulate, maneuver, and exploit longstanding, accepted industry-wide practices for financial gain;
   b. intimidate physicians into absorbing capitation losses caused by partial reimbursement for services provided through the exertion of their economic power;
   c. manipulate the coding practices which have formed the basis for physician reimbursement from third party and government payers for decades in order to illicitly deprive physicians of payments they have rightfully earned; and
   d. knowingly and systematically deny and delay payments due physicians and profit from the moneys wrongfully retained.

8) Plaintiffs bring this action on behalf of themselves and on behalf of a Class of similarly situated persons to seek redress for Defendants' illegal acts, which have resulted in loss of property and detriment to Plaintiffs' businesses.

9) Moreover, Plaintiffs bring this action because they believe Defendants' scheme, as defined below, is detrimental to the health of their patients and to the welfare of the general public, i.e. without adequate and timely payments, physicians cannot maintain their practices and cannot provide the continuity of care that patients require and which Plaintiffs seek to provide as a matter of sound medical practice.

10) Plaintiffs seek a declaration regarding Defendants' fraudulent practices as set forth herein, injunctive relief, and to recover for themselves and the rest of the Class

damages and restitution for the injury to their businesses and property resulting from Defendants' activities.

## CLASS ALLEGATIONS

11) The Class consists of all physicians, medical practitioners, and physician/medical groups who participate, or participated, in Keystone HMO's health maintenance organization in the Commonwealth of Pennsylvania from 1996 to the present day (the "Class").

12) Plaintiff is a member of the Class.

13) It is estimated that the Class consists of hundreds, if not thousands, of persons throughout the Commonwealth of Pennsylvania and is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable. The exact number of Class members is presently unknown to Plaintiffs but can be readily ascertained through discovery from Defendants' books and records.

14) There are questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make Class certification appropriate in this case, including whether Defendants, acting individually, collectively, or through their officers, agents, employees or the like:

    a. manipulate(d), maneuver(ed), and exploit(ed) longstanding, accepted industry-wide practices for financial gain;

    b. intimidate(d) physicians into absorbing capitation losses caused by partial reimbursement for services provided through the exertion of their economic power;

    c. manipulate(d) the coding practices which have formed the basis for physician reimbursement from third party and government payers for

      decades in order to illicitly deprive physicians of payments they have rightfully earned;

  d. knowingly and systematically deny(ied) and delay(ed) payments due physicians and profit(ed) from the moneys wrongfully retained;

  e. in carrying out the overt acts and fraudulent and extortionate scheme described herein, whether the Defendants engaged in, *inter alia*, conduct in violation of federal laws, including 18 U.S.C. §§ 1341 and 1343, 18 U.S.C. §§ 1341 and 1346, 18 U.S.C. § 1343 and 1346, 18 U.S.C. § 1951(b)(2), 18 U.S.C. § 1952(a), 18 U.S.C. § 1954, and 18 U.S.C. § 1961 *et seq.*;

  f. in carrying out the overt acts and fraudulent and extortionate scheme described herein, whether the Defendants engaged in, *inter alia*, conduct in violation of their Duties of Good Faith and Fair Dealing; and

  g. in carrying out the overt acts and fraudulent and extortionate scheme described herein, whether the Defendants violated 40 Pa. Cons. Stat. § 991.2166.

15) The claims asserted by the named Plaintiffs are typical of the claims of the members of the Class.

16) This Class action satisfies the criteria set forth in F.R.Civ.P. 23(a) in that Plaintiffs are members of the Class. Plaintiffs will fairly and adequately protect the interests of the members of the Class; their interests are coincident with and not antagonistic to those of the Class; they have retained attorneys experienced in Class and complex litigation as their counsel; and they have, or through their counsel have, access to adequate financial resources to assure that the interests of the Class are adequately protected.

17) A Class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (a) it is impractical for most members of the Class to prosecute separate, individual actions; and

(b) after the liability of the defendants have been adjudicated, the individual and aggregate claims of all members of the Class can be determined by the Court.

18) Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members which would substantially impair or impede the ability of other Class members to protect their interests.

19) Class certification is also appropriate because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiffs and the Class members.

## FACTUAL BACKGROUND

20) Plaintiffs incorporate and re-allege the preceding paragraphs as if fully set set out herein.

21) Keystone HMO's website defines it as a "prepaid, managed health care plan. This simply means we provide and pay for all medically necessary health services, as well as many preventative services, for our Members."

22) Keystone HMO further proclaims itself as "unique" in that "it is an independent HMO affiliated with Capital Blue Cross and Highmark Inc., trusted names in health care for nearly 60 years. Because it is the HMO of 'the Blues®' it does not give profits into the hands of stockholders. All profits go back into Capital Blue Cross and Highmark Inc.—which in turn goes back into the community."

23) Further highlighting the purported benefits of participation in Defendants' HMO, Keystone HMO affirmatively represents to its members that membership in its plan establishes an entitlement to:

- --access to quality care without concern for pre-existing condition clauses;
- --all Medically necessary tests, including laboratory, X-ray, or EKG, ordered by or arranged through your PCP ("Primary Care Physician");
- --no dollar limits on hospitalization;
- --Specialty Care, when your Primary Care Physician determines that you need care from a specialist;
- --Preventative Health Services to keep you healthy, including periodic physicals, immunizations, mammograms, routine gynecological exams, well-child care and more; and
- --Maternity and Newborn Care including prenatal office visits, delivery and hospital care for mother and infant, necessary test and services, and a postnatal office visit.

24) In summary, minus a possible co-payment, Keystone HMO affirmatively represents to its members that it will cover the following services, and among others:

- -- Doctor Visits
- -- Emergency and Urgent Care
- -- Routine and Preventative Health Services
- -- Maternity and Newborn Care
- -- Inpatient Hospital Services
- -- Outpatient Hospital Services
- -- Mental Health and Substance Abuse Services

25) Indeed, Keystone HMO requires its Primary Care Physicians and Practices, such as Plaintiffs, to provide these services pursuant to their contract(s) therewith.

26) Defendants pay doctors through two types of compensation arrangements: capitation and fee for service. Regardless of the method of payment, all of the substantive practices, policies, and procedures of Defendants' health plans are established,

implemented, monitored and ratified by Defendants themselves. Keystone HMO does not function as an independent corporate entity but rather has an alter-ego relationship with, and is directed by, the other named Defendants who generally direct and control the operations of said subsidiaries.

27) When Defendants pay capitation, they sometimes delegate certain functions to independent physicians' associations ("IPAs"). The IPAs then carry out the delegated functions on behalf, and at the direction, of the Defendants.

28) Defendants mandate that the IPAs comply with the policies and procedures of the Defendants when they carry out delegated functions. Defendants also audit the IPAs to ensure that they are carrying out the delegated functions in a manner consistent with the policies and procedures of the Defendants. If any IPA fails to do so, the Defendants reserve the right to revoke the delegated function. The delegated functions often include claims handling.

29) In regard to delegated functions, IPAs function as mere conduits through which the Defendants conduct business. Accordingly, any reference throughout the complaint to "Defendants" shall include all of Defendants' operations, whether the functions are performed directly by Defendants or by Defendants operating through subsidiaries or through IPAs.

### Defendants' Manipulation of the CPT Codes

30)   Plaintiffs and Class members provide medical services to Defendants' insured members and to members of Defendants' health plans and are to be reimbursed by Defendants for those services.

31)   Following the provision of medical services, Plaintiffs and Class members must submit a claim submission form.

32)   For example, physicians universally utilize the HCFA-1500 form for claims submissions to third party payers. The HCFA 1500 is a health insurance claim form developed by the Health Care Financing Administration. This form contains the threshold information required for processing a claim.

33)   Among other information, the HCFA-1500 form requires a diagnosis code and a CPT procedure code for physician services.

34)   CPT codes were first developed and published by the American Medical Association ("AMA") in 1966.

35)   According to the AMA, Current Procedural Terminology ("CPT") is a listing of descriptive terms and identifying codes for reporting medical services and procedures. The purpose of CPT is to provide a uniform language that accurately describes medical, surgical, and diagnostic services. CPT procedure codes include codes for, among other things, office visits, that are variable based on the complexity or length of the office visit. These codes are called E and M codes for 37 evaluation and management activities. The data contained on a HCFA-1500 form does not contain anything that would allow a