benefit analyst or claims processor to make a distinction between a "5", a "4", a "3", a "2" or a "1" E and M code.

36) CPT codes provide the basis for physician reimbursement, indicating to the insurer the services provided by the physician.

37) This uniform coding process allows automated logic to be applied to physicians across-the-board.

38) Plaintiffs, and each Class member, necessarily and reasonably relied on the understanding that they would be paid by one or more of the Defendants for medically necessary services and procedures according to the CPT codes for the procedures and services that they performed.

39) Rather than paying Plaintiffs for medically necessary services in accordance with standard coding practices, Defendants have engaged in a common scheme designed to systematically deny, delay and diminish payments to health care providers.

### Systematic and Intentional Delay and Denial of Payments

40) Defendants do not use "medical necessity" criteria in making coverage and treatment decisions and in reimbursing physicians. Instead, Defendants use cost-based criteria to approve or deny benefit claims by Plaintiffs and the Class. These undisclosed cost-based criteria include Defendants' own guidelines and criteria, as well as guidelines developed in concert with third parties, such as those promulgated by such third parties as Milliman & Robertson and InterQual. Defendants and these third parties have developed

purported actuarial criteria, unrelated to medical necessity, for the purpose of wrongfully denying payment of claims and reducing payments to providers.

41) While the required "bundling" of submissions is highly effective at concealing such, it is believed and therefore averred that Defendants systematically deny valid claims submitted for payment by the Individual Plaintiffs and by the Class members.

42) Defendants also deliberately delay payments in order to benefit financially from the "float" created by their retention of payments due to physicians.

43) Also, Defendants have developed a set of "evaluation" criteria, by which Plaintiffs and the Class members are supposed to be able to obtain "bonus" payments to offset the administrative costs of processing claims in the manner dictated, directed, and controlled by Defendants. It has been specifically acknowledged by Defendants, their agents, officers, employees, and others, that meeting these "criteria" is impossible, i.e. they are fixed and evaluated in such a manner as to ensure that a pre-determined level of "efficiency" can neither be achieved or exceeded. The efficiency criteria are the "red herrings" devised and proffered by the Defendants in an attempt to justify the withholding of monies rightfully due Plaintiffs and the Class.

44) Furthermore, it is believed and therefore averred that, Defendants provide incentives to claims reviewers to delay or deny payments. For example, it is believed and therefore averred that, Defendants provide direct cash bonuses and other financial incentives to claims reviewers who deny claims for service or limit hospital admissions and stays regardless of whether those claims or hospital admissions are medically necessary. Such claims reviewers are either employees of Defendants or are contracted

third parties. Examples of such third party reviewers employed by the industry, and believed and therefore averred to be utilized by Defendants and their additional co-conspirators not named as defendants in this suit, are Magellan Behavioral Health ("Magellan"), Protocare, Inc., (formerly known as Value Health Services, Inc.) and Aztec, Inc. ("Aztec"). It is also believed and therefore averred that the bonuses and financial incentives include direct bonus payments and other benefits to claim reviewers who deny a certain percentage or absolute number of submitted claims for hospital costs from Plaintiffs and the Class.

### Downcoding and Bundling

45) Defendants have also implemented systematic claims processes to manipulate CPT codes submitted by Plaintiffs and Class members in order to "downcode" and "bundle" claims, and to delay and wrongfully deny payments. Defendants use software such as that sold and licensed by McKesson HBOC or other comparable software capable of modifying CPT code protocols set by the AMA. This enables Defendants to manipulate the reimbursement rates.

46) It is believed and therefore averred that Defendants engage in automatic "downcoding" of claims submitted by physicians, a process whereby, among other things, Defendants arbitrarily, and without prior notice, change the code assigned to rendered services so as to reduce the payments due physicians.

47) It is believed and therefore averred that Defendants also engage in undisclosed automatic "bundling" of claims submitted by physicians, a process whereby, among other

things, Defendants arbitrarily, and without prior notice, combine the codes of two or more procedures in order to reduce the payments due physicians.

48) As a result of Defendants' practices, Plaintiffs and the Class bear the burden of ever-increasing expenditures of administrative time and expense, all without compensation. It is believed and therefore averred that these practices, which are illicitly and covertly passed onto the Commonwealth's medical practitioners, costs Plaintiffs and the Class millions of dollars in "write offs" annually.

### Coercive Use of Economic Power

49) Despite a growing number of complaints to Defendants regarding these practices, Defendants have refused to re-evaluate or change their practices.

50) Instead, Defendants have utilized their overwhelming and dominant economic and market power to coerce Plaintiffs and the Class into providing care and accepting Defendants' policies and practices on a "take it or leave it" basis. In truth and in fact, when confronted about the increasing capitation "write-offs" and loss of "bonus" monies, Keystone HMO officers, agents, employees and others are so emboldened by their economic power that they actually admitted to Plaintiffs that there was "no way" a participating physician could satisfy their reimbursement "criteria," attain their "bonus" goals, or receive adequate capitation monies to cover the costs of the services they are obligated to provide. Incredibly, in response to repeated demands for an explanation as to why Plaintiffs' "efficiency" rating was based on knowingly and acknowledged invalid sampling data, Defendants cut Plaintiffs efficiency rating **in half** at the next evaluation period.

51) Defendants' economic and market power is exacerbated and enforced through such heavy-handed tactics. Defendants refuse to meaningfully negotiate regarding policies, practices, payment rates, and contract provisions. In truth and in fact, as enumerated above, if a participating provider "dares" to question their losses or to further attempt to obtain reimbursement monies they are rightfully owed, Defendants retaliate by further tightening reimbursements, by further "shaving" reimbursements thereto. The message Defendants send is clear: He who controls the purse and the consumer, controls the provider. Don't mess with us.

52) Defendants fail to provide Plaintiffs and Class members due process or a reasonable appeal process. And, in fact, as shown above, they retaliate swiftly against those who dare to question what monies they receive.

### Fraudulent Practices Related to Capitation Agreements

53) In addition to the above, Defendants have undertaken the following specific activities directed at physicians operating pursuant to capitation arrangements:

   a. Defendants enforce the same scheme with respect to billing for fee for services as is determined by their "peer" industry groups;
   b. Defendants retain excessive amounts of the premium dollar paid by the insured members, before making capitation payments to IPAs and health care providers;
   c. Defendants deduct inappropriate amounts before calculating the amounts due to physicians and other health care providers in the capitated arrangements;
   d. Defendants refuse to begin paying capitation immediately upon enrollment of the members. They retain premiums from the members until the members need services from physicians. The failure to assign immediately not only defrauds doctors, but also undermines the actuarial assumptions on which capitated arrangements are purportedly based. The rationale of capitation is that the doctor services a group of patients,

only some of which need services in a given month. The capitated payments for the "well" members is needed to help to compensate for the services provided to the "sick" members. If there are not enough well members, then the doctors provide more services than the capitated payments will support. Defendants' delayed assignment of the members until they are sick, clearly is intended to shave monies that they know doctors need to meet their care obligations;

e. Defendants have also defrauded doctors through misuse of "risk" pools in the pharmaceutical and hospital areas. Under these pools, doctors pay for part of the costs and theoretically should share in part of the savings from hospital and pharmaceutical services and products. If the doctors use preventive care to keep patients from having to be hospitalized and to keep them from having to take prescription drugs, then they can benefit under such arrangements. However, Defendants have routinely charged physicians for hospital services and prescription drugs that their members did not use, thereby cheating the doctors out of money that they are due;

f. Defendants systematically pass along costs of health care that the doctors did not agree to assume. An example is in the area of injectible drugs administered in the doctors' offices. Doctors agree to provide existing injective drugs out of their capitation rates. However, in this day of rapidly developing medical and drug technology, injectible drugs are frequently developed during the term of the physicians' capitation contracts. In such instances, the Defendants often insist that the doctors provide the injectible drugs with no compensation. An example has recently occurred with respect to immunizations for infants. Under the Defendants' capitation practices, doctors providing such immunizations "write-off" all but a few dollars of the actual cost of providing such services. In fact, Defendants have insisted that costly injectible immunizations be provided by doctors knowing that the cost of doing such vastly exceeds **the entire yearly capitation payments** for the member in question;

g. Defendants have exacerbated the problem with prescription drugs and injectibles because, it is believed and therefore averred, they receive rebates from pharmaceutical companies and refuse to credit doctors with their share of the rebates. Pharmaceutical companies routinely provide Defendants with rebates based upon the drugs used by members. The pharmaceutical companies do so to encourage Defendants to place their drugs on the formularies from which the doctors must choose drugs for their patients. In the risk pools, Defendants charge the doctors for the cost of the drugs before the rebates, even though the rebates significantly reduce the actual costs. In addition, defendants require doctors to assume the cost of the injectible drugs before the rebates, even though the actual cost to the health plan is, or would be, significantly less; and

15

    h.    Defendants utilize capitation arrangements with respect to pools of patients that are not sufficiently large to permit sound actuarial projections.

54) As a result, Plaintiffs and others similarly situated, are forced to absorb millions of dollars per quarter, tens of millions per year, in write-offs.

55) As alleged hereafter, Plaintiffs and others similarly situated receive the subject "Primary Capitation/Eligibility Statements" monthly vis-à-vis electronic transmission received and retrieved through IPA or other similar systems Computer networks.

### Conspiracy

56) Defendants have not undertaken the above practices and similar activities in isolation, but instead have done so as part of a common scheme and conspiracy. The conspiracy could not be effective without the enthusiastic participation of all of the conspirators.

57) Defendants collectively control a majority of the subscribers and providers in the managed care market. Defendants collectively exercised their overwhelming and dominant economic and market power to coerce Plaintiffs and the Class in an extortionate manner.

58) Each Defendant, with knowledge and intent, agreed to the overall objective of the conspiracy and each Defendant agreed to commit at least two predicate acts and each Defendant agreed to participate in the conspiracy.

59) Moreover, the conspiracy was and remains successful because each Defendant agreed to enact and utilize the same devices and fraudulent tactics to defraud the Class members.

60) Numerous common facts and similar activities, which evidence existence of a conspiracy, exist among all of the Defendants and others yet to be identified, including:

    (a) the claims procedures and the data physicians are required to provide in submitting claims;

    (b) the medical necessity criteria and Defendants' use of guidelines developed in concert with third parties;

    (c) the systematic claims processes in manipulating CPT codes, downcode and bundle claims, which delay and wrongfully deny payments; and

    (d) the payment procedures under the capitation arrangement, including but not limited to:

        1) retaining amounts of premium dollar paid by the insured members before making capitation payments to health care providers;

        2) inappropriately deducting amounts before calculating the amounts due to physicians and other health care providers;

        3) unfairly retaining premiums from the members until the members need services from physicians;

        4) misusing "risk" pools for pharmaceutical and hospital services;

        5) systematically defrauding physicians by passing along costs of health care that the doctors did not agree to assume;

        6) failing to pass along rebates and discounts to doctors; and

        7) downcoding services provided by capitated physicians and then utilizing this data to decrease capitation rates.

61) The conspiracy was conducted during the past ten years and was implemented by:

    a. the development and adoption of specific clinical practice guidelines and related healthcare review criteria such as, for example, those established by Milliman & Robertson and InterQual;

b. the development and utilization of automated and integrated claims processing and other systems such as, for example, those generated by McKesson HBOC, Ingenex and FACTS Services, Inc.;

c. the joint development of accreditation standards and industry information by the National Committee for Quality Assurance;

d. the utilization and purchase of reimbursement guidelines such as those offered by the Health Insurance Association of America;

e. participation and coordination in trade associations such as the Health Insurance Association of America and the American Association of Health Plans;

f. participation and coordination in industry groups such as the Coalition for Quality Healthcare and Integrated Health Care Organization; and

g. participation and coordination in private jointly owned corporations.

62) This conspiracy also involves, *inter alia*:

a. the development and adoption of clinical practice guidelines and related healthcare review criteria;

b. the development of claims processing and other systems;

c. the joint development of accreditation standards by the managed healthcare industry;

d. participation in trade associations, including the American Association of Health Plans and Health Insurance Association of America ("HIAA"), that develop common industry standards and/or act as vehicles by which their members could exchange sensitive business information, disseminate unified information to governmental agencies, to the press, and to the public or otherwise collude; and

e. the use of industry informational sources to facilitate such collusion.

63) As a result of Defendants' fraudulent scheme and racketeering activities, the Plaintiffs and Class members have been injured in their business and property.

## Allegations Relating to RICO

64) Plaintiffs incorporate and re-allege the preceding paragraphs as if fully set out herein.